CREAM OF WHEAT COMPANY, Appellant, *v.* THE ARTHUR H. CRIST COMPANY, Respondent.

SAME, Appellant, *v.* SAME, Respondent.

Contract — when contracts are definite and unambiguous the courts should not make new contracts by construing them contrary to their plain terms — advertising contract — the words " paid circulation," used in guaranty of circulation of a magazine, do not include subscribers whose names are on the books but whose subscriptions have not been paid.

1. Where contracts are definite and unambiguous and express in plain terms the undertaking of each party and the mutual intention existing between them, the court will not give to the express language of such contracts a strained or unreasonable construction.

2. Where the publisher of a monthly magazine, in a contract to publish advertisements for a year for a stated sum per month, guaranteed that the average paid " circulation " of each issue of the magazine should not be less than a designated number of copies " published and sold and delivered * * * to *paid subscribers* and to news agencies, exclusive of all returns from news agencies and copies given away," *held*, in an action to recover the rebate for a lesser circulation, provided for in the contract, that a person

who subscribed and paid for some previous year who had not discontinued his subscription, whose name had not been written off by the publisher and to whom the publisher had regularly mailed a copy of each issue, was not a paid subscriber for the year in question and embodied in the term " circulation." (*Newhall* v. *Appleton*, 114 N. Y. 140, distinguished.)

*Cream of Wheat Co.* v. *Crist Co.*, 166 App. Div. 870, reversed.

(Argued January 23, 1918; decided February 15, 1918.)

APPEAL, in each of the above-entitled actions, from a judgment of the Appellate Division of the Supreme Court in the third judicial department, entered June 22, 1915, affirming a judgment in favor of defendant entered upon the report of a referee.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Rome G. Brown* and *Evan Hollister* for appellant. The referee erred in his conclusion of law that the meaning of the words " paid subscribers," as used in the definition of the term " circulation " in the contracts, was not limited to subscribers who had paid for their 1911 or 1912 subscriptions either in advance or during the year covered by each contract respectively, and, therefore, erred in holding that the circulation of the magazine to paid subscribers was not less than 63,000 copies, as guaranteed by the contracts. (*Waters* v. *Creagh*, 4 S. & P. 410; *Starr* v. *Delaware Co.*, 40 Ind. App. 70.)

*James F. Hubbell* for respondent.

HOGAN, J. The plaintiff is a manufacturer of cereal products. The defendant is engaged in the printing business and publishes a monthly magazine known as *American Motherhood.*

August 27th, 1910, the parties entered into a contract wherein defendant undertook to insert in a magazine published by defendant a full page advertisement to be

furnished by plaintiff during each month of the year 1911, in consideration of a stated sum to be paid therefor by plaintiff.

The contract provided: " Party of the first part [defendant] does hereby guarantee that the average circulation of the above-mentioned publication shall be not less than sixty-three thousand (63,000) copies per issue for the time during which the above advertisement shall run, and it is understood and agreed that the term ' circulation ' for the purposes above mentioned shall be construed as follows:

" The total number of copies of each issue of the publication above mentioned which shall be published and sold and delivered by the publishers thereof both to paid subscribers and to news agencies, exclusive of all returns from news agencies and copies given away in any manner whatsoever."

The plaintiff was by said contract at any time to be permitted access to the books of defendant to ascertain the circulation of the magazine, not oftener than twice in each year. In the event that such examination or examinations did not bear out the circulation embodied in the contract and should be found to have averaged materially less than sixty-three thousand copies per issue during the term for which the advertising was to run, the expense of the examination was to be borne by defendant, otherwise by plaintiff. Should such examination disclose the circulation to be materially less than stated in the contract defendant agreed to make a *pro rata* rebate in cash for such shortage in circulation.

About September 1, 1912, the plaintiff caused an examination to be made of the books of the defendant for the year 1911, which audit disclosed, as asserted by plaintiff, that the total net paid circulation per issue was 25,975 as compared with 63,000 as provided for in the contract. The rebate upon such examination would

amount to $423.14, the cost of the examination was $326.05, making a total of $749.19, and to recover that sum plaintiff brought an action.

A second contract was entered into between the parties identical in terms with the contract above referred to, save that the second contract covered the year 1912. An audit of the books of defendant was made by plaintiff between May 20th and July 1st, 1913, which disclosed that the average circulation per month during the year 1912 was 27,428 instead of 63,000 as guaranteed by the contract, and by reason thereof plaintiff in the second action sought a recovery for the rebate of $328.28, and the further sum of $809.06 cost of the audit, a total of $1,137.34.

The two actions were tried together before a referee and resulted in the dismissal of the complaint in each case.

The referee found as matter of fact that at the time the plaintiff entered into the contract there was a general usage and custom existing in this country known to plaintiff and which prevailed among advertisers and between advertisers and publishers to the effect that in determining the number of subscribers to a magazine in a given year for the purpose of calculating its value as an advertising medium the subscribers were divided into two classes, namely, paid and unpaid; that the first class or paid subscribers should and did include those who had paid their subscriptions for the year in question and also those who had subscribed and paid for some years prior to the year in question who had not discontinued their subscriptions, who had not been omitted or written off by the publishers, but to whom the publisher had regularly mailed each issue for the year in question; that the second class or unpaid subscribers included all other copies of the magazine given away in any manner whatsoever, and, as conclusions of law, that the words

" paid subscribers " in said contract included the sub-
scribers who at the time of said audit had paid their
subscriptions for the year 1911 or some previous year
and all subscribers who had subscribed and paid for the
magazine at some time prior to 1911 and had received
the issues of said magazine for the year 1911 and were
legally liable by contract, express or implied, to pay the
subscription price for the year 1911.

The foregoing finding of fact and the conclusion of law
by reason thereof which is the basis of the decisions made
in these cases discloses that the courts below ignored the
definition which the parties to the contract gave to the
term " circulation " and held in substance that a person
who subscribed and paid for the year 1903, who had not
discontinued his subscription and whose name had not
been written off by the publisher and to whom the
publisher had regularly mailed a copy of each issue was a
" paid subscriber " for the year 1912 and embodied in
the term " circulation." Such construction is unwar-
ranted. The intention of the parties and their under-
standing of the provisions of the contract at the time of
the execution of the same is apparent from the language
employed therein, especially when considered in relation
to the subject-matter. The parties were proficient in
the business in which each was engaged. They severally
understood the value of advertising and the advantages
of circulation of the medium of advertisements. They
met on equal footing. By the terms of the contracts
defendant guaranteed that the average circulation of the
publication should not be less than 63,000 copies per
issue. Had the contract terminated there, the term
" circulation " might be subject to construction dependent
upon general custom and usage prevailing between adver-
tiser and publisher. The parties, however, did not
desire to leave the construction of the term " circulation "
in doubt and thereupon for the purpose of making definite

and certain the meaning of the same and with full knowledge of the significance thereof, with a view of avoiding misunderstanding in the future, they covenanted that the term " circulation " should be construed as the total number of copies of each issue which shall be published and sold and delivered by the publisher thereof to *paid subscribers* and to news agencies, exclusive of all returns from news agencies and copies given away in any manner whatsoever, and the guaranty on the part of the defendant was that the average number of each publication to be sold and delivered to " paid subscribers and news agencies " exclusive of copies returned or given away should not be less than 63,000 per issue.

When the contracts were made the plaintiff was privileged to and did insist that for the consideration to be paid by it the minimum circulation should be measured by the number of magazines sold and delivered to paid subscribers and to news agencies with the exclusions noted, and the defendant acceded to that proposition.

It was found by the referee that the average number per issue for 1911 for which the subscription price had been paid at the time of the audit (about September 1st after the expiration of the year) was 25,975, and for 1912 at the time of the audit 27,428, and as claimed by plaintiff. The price of the magazine was one dollar per year. An examination of the books of defendant disclosed that the gross income from the sale of the magazine in 1911 was $29,903.05 and in 1912 $28,255.66, which included sums paid down to the date of the audit made in each year respectively, a most material fact which seemingly was disregarded. The slight excess in each year over the number of subscriptions found was accounted for by the auditors, and the record discloses that plaintiff's audit was eminently fair and that no attempt was made to secure a narrow or unreasonable

enforcement of the contract, that allowances were made by the auditors for not only every subscriber who paid during the year 1911, but down to the time of the audit months later and who had paid his subscription for the full year or merely a portion thereof, and like allowance was made for old subscribers long delinquent who paid during the year or down to the time of the audit. Plaintiff, therefore, not only made allowance for paid-up subscribers but included therein paying subscribers down for several months after the close of the year for which the audit was made. The number thus estimated on the trial by plaintiff was as stated found by the referee and was undisputed on the trial.

A suggestion that an individual resident in some distant state who had paid a subscription for *some* year, ten, twenty or more years before the year 1911, and had not formally and expressly discontinued his subscription, might be liable under an implied contract although not paying for said year and be considered under the contracts in question a " paid subscriber " for the year 1911 and for as many years thereafter as a publisher may keep his name on a mailing list and fail to mark it off his books, does not merit acquiescence on our part.

The conclusion reached by us is not in conflict with *Newhall* v. *Appleton* (114 N. Y. 140). Had the contract in the *Appleton* case been specific and defined the term " each and every order " it would be more similar to the contracts under consideration here and another question than the one there considered would be submitted for consideration.

The contracts in question were definite and unambiguous. The parties thereto expressed in plain terms the undertaking of each party and the mutual intention existing between them. It is not for the courts to make new contracts between them or to give

their express language a strained or unreasonable construction.

The judgments herein should be reversed and judgment in action number one ordered in favor of plaintiff against the defendant for the sum of $749.19, with interest thereon from the time of the commencement of the action, together with costs in all courts, and in action number two judgment is ordered in favor of plaintiff against defendant in the sum of $1,137.34 and interest thereon from the date of the commencement of the action, with costs in the courts below.

HISCOCK, Ch. J., CHASE, CARDOZO, POUND, McLAUGHLIN and ANDREWS, JJ., concur.

Judgments accordingly.